In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 17-1757

JAMES HORTON,
as the Independent Administrator
of the Estate of Michael DeAngelo Sago, Jr.,

*Plaintiff-Appellant*,

*v.*

FRANK POBJECKY,
GARY CARUANA, and
WINNEBAGO COUNTY,

*Defendants-Appellees*.

_____

Appeal from the United States District Court for the
Northern District of Illinois, Western Division.
No. 12 C 7784 — **Frederick J. Kapala**, *Judge*.

_____

ARGUED NOVEMBER 1, 2017 — DECIDED FEBRUARY 27, 2018

_____

Before MANION, KANNE, and ROVNER, *Circuit Judges*.

MANION, *Circuit Judge*. Sixteen-year-old Michael DeAngelo Sago, Jr., and three other young men attempted to rob a pizzeria at gunpoint. Frank Pobjecky, an off-duty police

officer waiting for a pizza, shot and killed Michael.[1] James
Horton, as administrator of Michael's estate, brought various
federal and state claims against Pobjecky and others. The
district court granted summary judgment for Defendants on
all claims, concluding Pobjecky's use of deadly force was
reasonable and justified, and did not violate the Fourth
Amendment. We affirm.

## I. FACTS

### A. Surveillance Videos

On review of summary judgment, we view the facts in the
light most favorable to the nonmovant and draw reasonable
inferences in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.
242, 255 (1986); *Yahnke v. Kane County, Ill.*, 823 F.3d 1066, 1070
(7th Cir. 2016). The parties agree about some facts, but they
vigorously contest others.

Four cameras captured surveillance videos of portions of
the events. According to the videos, the encounter lasted less
than a minute. The first video shows the parking lot and
sidewalk outside the front door of Marie's Pizza in Rockford,
Illinois. The second video shows the same area from a
different angle. The third video shows the kitchen. The fourth
video shows the front door, entrance area, counter, and cash
register from inside the pizzeria. Although on summary
judgment we generally view the facts in the light most
favorable to the nonmovant, in rare circumstances when
video footage clearly contradicts the nonmovant's claims, we
may consider that video footage without favoring the

---

[1] We refer to Decedent Michael Sago and to Brandon Sago, another
assailant, by their first names because they share a surname.

nonmovant. *Scott v. Harris*, 550 U.S. 372, 378–81 (2007) ("The Court of Appeals … should have viewed the facts in the light depicted by the videotape."). This is because on summary judgment we view the facts in the light most favorable to the nonmovant only if there is a genuine dispute about those facts. *Id.* at 380. When video footage firmly settles a factual issue, there is no genuine dispute about it, and we will not indulge stories clearly contradicted by the footage. Of course, videos are sometimes unclear, incomplete, and fairly open to varying interpretations. The story here is very short and violent.

### B. Armed Robbery

Late Saturday evening, October 1, 2011, Frank Pobjecky, an unarmed off-duty police officer, waited for the pizza he ordered at Marie's Pizza. He was the only customer inside. He was in the break area with Vincenzo Tarara (the restaurant manager) and David Weidner (the delivery driver). Andres Briseno (the cook) was in the kitchen.

The break area was separated by a cooler from the public entrance area depicted by the fourth video. No video captured the break area or the cooler. Tarara carried a concealed semi-automatic handgun on his hip. Pobjecky knew about it.

Suddenly four young men entered the front door of the pizzeria. The videos show the first of these men entering at timestamp 22:26:32. One of these men, Lamar Coates, held a revolver. He and Brandon Sago barged into the break area separated from the entrance by the cooler. Desmond Bellmon skirted the counter and attacked the cash register. Michael arrived at the front door last, and stood in the entrance,

holding the door open. He was the lookout.[2] All four assailants wore sweatshirts with hoods up. Michael wore a light color, while the others wore a dark color.

Tarara heard the door chime when the assailants entered. He approached the front area and encountered Coates, Brandon, and Bellmon. Tarara did not surrender. Instead he yelled, "get the hell out of here, you're not getting any of my f'ing money." Pobjecky and Tarara testified that Coates pointed his gun at each of them and demanded money. In response to Pobjecky's Local Rule 56.1 statement of facts, Horton denied that Coates threatened Pobjecky or Tarara, demanded money, or said anything before the struggle for Coates's weapon began. But in Horton's answer to Pobjecky's request to admit facts, Horton had already admitted Coates threatened Pobjecky or Tarara, and maybe both, with a gun.

According to Horton, Tarara reached for his own weapon, reconsidered, slammed Coates against the cooler, and struggled for Coates's revolver. For several terrifying seconds Tarara and Coates both had their hands on Coates's gun. Tarara testified Coates tried to shoot him. Tarara fought for his life. He testified he could see a round down the barrel, and he could feel Coates trying to pull the trigger. Horton disputed below whether Coates tried to pull the trigger during the struggle, but the district court found this issue immaterial.

There is ultimately no dispute that Coates approached Tarara and Pobjecky with a gun and threatened at least one of

---

[2] In his response to Pobjecky's Local Rule 56.1 statement of facts, Horton denied Michael was the lookout. But during oral arguments before us, counsel for Horton acknowledged Michael was the lookout.

them with it, and that Tarara grabbed Coates's gun and struggled for possession of it. According to Horton, the struggle for Coates's gun only involved Coates and Tarara. Pobjecky tried to grab Tarara's gun from his hip. Brandon and Bellmon joined the melee. No cameras captured the skirmish for the guns.

Michael did not join the struggle. He never grabbed for a gun. The fourth video shows Michael and Bellmon turn their heads toward the struggle at timestamp 22:26:46, apparently as soon as they heard the struggle begin. Bellmon left the counter at about 22:26:47 and entered the break area. But the video shows Michael remained at the front door for a few seconds. Then at about 22:26:51 he left the front door and approached the area of the struggle, off camera.

The parties dispute what Michael did during the struggle for control of the guns. Horton claims Michael was not involved in the struggle, never grabbed for a gun, and just stood near the area with his arms down by his side doing nothing during the struggle. Horton points to the testimony of Pobjecky that Michael's arms were down by his side. Horton insists the record shows Michael never grabbed for a gun or scuffled for a gun, never tussled with anyone, never touched a gun, and did nothing during the struggle. Defendants, however, characterize Michael as inserting himself into the situation by entering the pizzeria and quickly approaching the struggle. At this stage, we accept Horton's view of the facts. With the possible exception of partial, fleeting shapes in the bottom left-hand corner of the fourth video, the struggle for control of the guns occurred entirely off camera. Pobjecky gained possession of Tarara's gun, and Tarara won the struggle for Coates's gun.

Horton claims that once Coates lost the struggle for his gun, he turned, headed for the exit, and saw Pobjecky two feet away pointing a gun at him as Tarara held the other gun. Pobjecky then shot Coates in the back without warning, holding the gun over Tarara's right shoulder. Bellmon ducked for cover behind the counter, and Brandon headed for the exit.

According to Appellees, Pobjecky fired the first shot at timestamp 22:26:56, about 10 seconds after Michael and Bellmon first turned toward the struggle when it apparently began. Horton does not dispute this account, and the videos seem to support it. Pobjecky did not announce he was a police officer or order anyone to stop. Pobjecky claims he did not have enough time to do that. With Tarara's gun, Pobjecky engaged each criminal suspect as they moved around the pizzeria. He shot Coates, Brandon, and Bellmon. According to Horton (citing Coates's testimony) Pobjecky had a look of anger, not fear, on his face when he shot Coates. Pobjecky did not give verbal warnings or commands to the assailants before shooting them.

Pobjecky shot Brandon as he headed for the door. Pobjecky and Tarara both pointed guns when Brandon exited, but only Pobjecky fired. During a break in the shooting, Bellmon headed for the door. Pobjecky shot at him but missed, although earlier in the incident Pobjecky shot him in the buttocks.

Pobjecky then shot Michael three times in the lower back. The parties dispute the circumstances immediately surrounding Pobjecky's shooting of Michael. Horton claims Pobjecky shot Michael three times as Michael crawled away from Pobjecky and toward the door. Horton claims Pobjecky did not consider Michael a threat because Pobjecky turned his

back on Michael before shooting him despite being trained never to turn his back on a threat.

But Pobjecky claims Michael bolted toward him from behind, coming within one or two feet of him, and startling him. Pobjecky claims he shot Michael as Michael advanced toward Pobjecky. Responding to the argument that turning his back on Michael showed he did not consider Michael a threat, Pobjecky notes that this argument wrongfully assumes he knew where Michael was before shooting him, and overlooks the fact that Pobjecky was outnumbered by multiple assailants who scattered to various directions. The district court generally characterized Michael as "crawling" while Pobjecky shot him. The video supports that view. And Pobjecky acknowledged during his testimony that when he shot Michael, Michael's hands and feet were on the ground. Pobjecky also testified that he did not shoot Michael to stop him from escaping.

The fourth video does not definitively resolve all these issues. It shows Michael leave the screen at about 22:26:52. He re-enters the screen at about 22:27:05. He appears to crawl past Pobjecky and toward the door, and Pobjecky appears to turn to face Michael. Pobjecky appears to fire the first shot into Michael at about 22:27:05 after Michael already passed Pobjecky. Pobjecky fired three shots into Michael, all from behind. The video seems to contradict Pobjecky's claim that "Decedent was advancing towards Pobjecky when he was shot" (Appellees' Br. at 23) and that "he was shot as he approached Pobjecky from behind and fled to the door" (*Id.* at 26). Rather, the video seems to show Pobjecky shot Michael the first time a split-second after Michael crawled past Pobjecky and away from him and toward the door. Pobjecky

then shot Michael two more times from behind as Michael attempted to crawl out of the pizzeria. The gunshot wounds showing the three bullets entered Michael's back also contradict Pobjecky's claim that he shot Michael as he advanced toward Pobjecky.

In the light most favorable to Horton, the video and gunshot wounds support his account that Pobjecky shot Michael from behind three times as Michael crawled away from Pobjecky and toward the door, and Pobjecky did not shoot Michael as he advanced toward Pobjecky. But the video also demonstrates Pobjecky was in close quarters with multiple, moving, potentially armed assailants, who forced him to make split-second, life-or-death decisions. And the video also shows that Michael approached Pobjecky's area generally from behind a split-second before Pobjecky turned and shot him.

According to the videos, the entire encounter lasted about 36 seconds from the moment the first assailant entered the front door at about 22:26:31 to the moment Pobjecky shot Michael the third time as he crawled out the front door at about 22:27:07.[3]

At about 22:27:16, Pobjecky locked the front door. Michael was prostrate on the sidewalk just outside that door. Pobjecky did not exit the pizzeria until police arrived, because he feared

---

[3] At oral argument, counsel for Horton claimed the timestamps on the video footage are wrong, and that the events actually lasted at least twice as long as the timestamps indicate. Horton disputed the accuracy of the timestamps below, but the district court found he failed to provide any supporting evidence, and therefore concluded it could properly rely on the timestamps. Horton did not raise this issue in his appellate brief, so he waived it.

for his life and the lives of others. He had no more bullets. He claims he did not know who had Coates's gun and he did not know whether anyone had another gun. But Horton claims Pobjecky knew (or must have known) Tarara had Coates's gun because Pobjecky stood close to Tarara who was openly holding Coates's gun during a portion of the encounter. At this stage, we accept Horton's view.

Pobjecky told Tarara to call 911. Tarara tried but had trouble, so Weidner called 911. The Winnebago County 911 Center received a call at 10:34 p.m. and dispatched police and paramedics. Pobjecky also placed a call on a direct line he had to a dispatcher. Briseno hit a panic button alerting authorities during the incident, at 22:26:52. Paramedics arrived about 11 minutes after Pobjecky shot Michael.

Pobjecky claims he did not see Michael prostrate on the sidewalk outside the pizzeria's front door until after police arrived. But Horton claims it is reasonable to infer Pobjecky knew Michael's location, and we accept that at this stage.

There is no dispute Pobjecky shot Michael three times in the lower back. An autopsy showed the bullets travelled upward through Michael's body, fracturing ribs, damaging multiple organs including his heart, and killing him. Horton claims Michael could have survived his wounds without treatment for five to forty minutes. Horton claims Weidner called 911 seven minutes after Pobjecky shot Michael, and paramedics arrived four minutes later. Marie's Pizza was very close to a hospital.

Coates was the only assailant to bring a gun into the pizzeria that night. But Pobjecky did not know that, and had no way to know that. Pobjecky fired the only shots in the

pizzeria that night. He shot all four assailants, and only in the back parts of their bodies. He never identified his office or gave any verbal warnings or commands before shooting. Tarara had Coates's gun during much of the incident, but never fired it.

All three surviving assailants were convicted of felony murder.

## II. Procedural Posture

Horton, as administrator of Michael's estate, sued Winnebago County Sheriff's Deputy Pobjecky; Winnebago County, Illinois; and Winnebago County Sheriff Gary Caruana. Count I brought a claim under 42 U.S.C. § 1983 against Pobjecky and the Sheriff for excessive force. Count II brought a claim under § 1983 against Pobjecky for failure to provide medical care. Counts III, IV, and V brought state-law claims against Pobjecky and the Sheriff. Count VI brought state-law indemnification claims against the County and the Sheriff.

The district court granted summary judgment for Defendants on all claims.

## III. Discussion

We review a grant of summary judgment de novo, construing the facts and making reasonable inferences in favor of the nonmovant. *W. Side Salvage, Inc. v. RSUI Indem. Co.*, 878 F.3d 219, 222 (7th Cir. 2017). We may affirm on any ground supported in the record, as long as that ground was adequately addressed below and the nonmovant had an opportunity to contest the issue. *Cardoso v. Robert Bosch Corp.*, 427 F.3d 429, 432 (7th Cir. 2005).

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The parties must support their assertions that a fact cannot be or is genuinely disputed by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials … ." FED. R. CIV. P. 56(c)(1); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). We view the facts in the light most favorable to Horton and draw reasonable inferences in his favor. *Anderson*, 477 U.S. at 255; *Yahnke*, 823 F.3d at 1070.

As below, Horton argues on appeal that genuine issues of material fact preclude summary judgment. The district court recognized that the parties presented different versions of the facts, but agreed with Defendants that the factual disputes were immaterial.

### A. Excessive Force

Sometimes a police officer's use of deadly force is reasonable and therefore constitutional. A police officer's use of deadly force on a suspect is a seizure within the meaning of the Fourth Amendment, so the force must be reasonable to be constitutional. *Scott v. Edinburg*, 346 F.3d 752, 755 (7th Cir. 2003). The Supreme Court set out the fundamental framework for analyzing excessive-force claims in *Tennessee v. Garner*, 471 U.S. 1 (1985), and *Graham v. Connor*, 490 U.S. 386 (1989). *See County of Los Angeles, Calif. v. Mendez*, 137 S. Ct. 1539, 1547 (2017). *Graham* and *Garner* stand for the proposition that a suspect has a constitutional right not to be shot by an

officer unless he "reasonably believes that [the suspect] poses a threat to the officer or someone else." *Weinmann v. McClone*, 787 F.3d 444, 450 (7th Cir. 2015).

Thus, a police officer may constitutionally use deadly force to defend himself and others in certain situations. "It is clear that, when an individual threatens a police officer with a deadly weapon, the officer is permitted to use deadly force in self-defense if the use is consistent with the principles set forth in *Tennessee v. Garner*." *Scott*, 346 F.3d at 757. When an officer reasonably believes an assailant's actions place "him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force." *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988) (emphasis omitted). An officer does not violate the Fourth Amendment by firing at a suspect when the officer "reasonably believed that the suspect had committed a felony involving the threat of deadly force, was armed with a deadly weapon, and was likely to pose a danger of serious harm to others if not immediately apprehended." *Ford v. Childers*, 855 F.2d 1271, 1275 (7th Cir. 1988).

As a form of defense of others, a police officer also may sometimes constitutionally use deadly force to prevent escape.

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has

> committed a crime involving the infliction or
> threatened infliction of serious physical harm,
> deadly force may be used if necessary to
> prevent escape, and if, where feasible, some
> warning has been given.

*Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985).

Determining whether the force was reasonable under the Fourth Amendment requires "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks omitted). This reasonableness test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* "The operative question in excessive force cases is 'whether the totality of the circumstances justifie[s] a particular sort of search or seizure.'" *Mendez*, 137 S. Ct. at 1546 (quoting *Garner*, 471 U.S. at 8–9).

The test is objective reasonableness. *Graham*, 490 U.S. at 396. A plaintiff must show the officer's use of force was objectively excessive from the perspective of a reasonable officer on the scene under the totality of the circumstances. *Id.* at 396–97; *Bell v. Irwin*, 321 F.3d 637, 639 (7th Cir. 2003).

We evaluate excessive-force claims for objective reasonableness based on the information the officers had at the time. *Mendez*, 137 S. Ct. at 1546–47. "What is important is the amount and quality of the information known to the

officer at the time he fired the weapon when determining whether the officer used an appropriate level of force." *Muhammed v. City of Chi.*, 316 F.3d 680, 683 (7th Cir. 2002) (citation omitted).

The actual officer's subjective beliefs and motivations are irrelevant. *Scott*, 346 F.3d at 756. "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Graham*, 490 U.S. at 397.

Also, we must refuse to view the events through hindsight's distorting lens. *Id.* at 396. We must consider the totality of the circumstances, including the pressures of time and duress, and the need to make split-second decisions under intense, dangerous, uncertain, and rapidly changing circumstances. *See Ford*, 855 F.2d at 1276. We must recognize that in such circumstances, officers often lack a judge's luxury of calm, deliberate reflection. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 at 396–97.

Judges view facts from afar, long after the gunsmoke cleared, and might take months or longer to decide cases that forced police officers to make split-second decisions in life-or-death situations with limited information. "We as judges have minutes, hours, days, weeks, even months to analyze, scrutinize and ponder whether an officer's actions were 'reasonable,' whereas an officer in the line of duty all too frequently has only that split-second to make the crucial

decision." *Ford*, 855 F.2d at 1276 n.8. The events here unfolded in heart-pounding real time, with lives on the line. Pobjecky lacked our luxury of pausing, rewinding, and playing the videos over and over.

Of course, the fluid nature of these situations also highlights the limited scope of the constitutional permission to use deadly force. Even though an officer may in one moment confront circumstances in which he could constitutionally use deadly force, that does not necessarily mean he may still constitutionally use deadly force the next moment. The circumstances might materially change. "When an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity." *Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993).

Finally, it bears noting that the availability of less severe alternatives does not necessarily render the use of deadly force unconstitutional. The Fourth Amendment does not require "the use of the least or even a less deadly alternative so long as the use of deadly force is reasonable under *Tennessee v. Garner* and *Graham v. Connor* … ." *Plakas v. Drinski*, 19 F.3d 1143, 1149 (7th Cir. 1994).

The relevant question is whether Pobjecky reasonably believed Michael posed a threat of death or serious bodily injury based on the information Pobjecky had during the robbery. The district court accurately summarized the salient facts. The incident lasted only about 45 seconds from the moment the first assailant entered the pizzeria to the moment Pobjecky locked the door. Pobjecky had limited time to react to four assailants attempting to commit an armed robbery. Pobjecky had to react to a struggle over a loaded gun. After

Coates made threats with a gun, Pobjecky reasonably assumed the three other assailants, including Michael, might be armed. As the district court correctly observed, we may not consider the fact that it turned out Michael was unarmed because Pobjecky did not know that, and had no reasonable way to know that, at the time. "Knowledge of facts and circumstances gained after the fact (that the suspect was unarmed) has no place in the trial court's or jury's proper post-hoc analysis of the reasonableness of the actor's judgment." *Sherrod*, 856 F.2d at 805. As long as the assailants were moving inside the pizzeria, they posed a threat. Considering the facts in the light most favorable to Horton, no reasonable jury could find Pobjecky's belief that Michael might be armed was unreasonable. Michael participated in an armed robbery while wearing a sweatshirt allowing easy concealment of a gun.

The district court compared this case to *Ford*, where we examined the totality of the circumstances known to the officer at the time and found no Fourth Amendment violation when the officer fired on a suspect because the officer "reasonably believed that the suspect had committed a felony involving the threat of deadly force, was armed with a deadly weapon, and was likely to pose a danger of serious harm to others if not immediately apprehended." *Ford*, 855 F.2d at 1275. The district court reasoned that here the case in favor of the officer is even stronger than it was in *Ford* because there the officer did not see a weapon and was not present during the felony, but here Pobjecky witnessed the commission of a dangerous felony, saw Coates make threats with a gun, and was out-numbered by the assailants, all of whom Pobjecky reasonably thought might be armed.

Horton attempts to distinguish Michael from the other three assailants. Michael's hoodie was a different color. He wore no mask. He entered last. He had no gun, never fought over a gun, and never said anything threatening. Horton goes so far as to characterize Michael as a mere "observer." But these distinctions ultimately make no difference. There is no dispute Michael participated in the armed robbery. Pobjecky was an off-duty, initially unarmed officer under immense pressure, facing multiple moving assailants over a short period of time. He had no reason to think that the color of Michael's hoodie or his lack of a mask distinguished him as harmless. Pobjecky had no way to know Michael entered the pizzeria last, and such knowledge is irrelevant anyway. Pobjecky had no way to know Michael was unarmed. Michael participated in an armed robbery and wore clothing that could conceal a gun or other weapon. Pobjecky reasonably assumed Michael posed an imminent threat of death or serious injury, even though he did not fight over a gun or say anything threatening.

Horton argued below, and on appeal, that Michael surrendered before or while Pobjecky shot him. Horton points to a footage frame showing Michael's arm elevated near the door as Pobjecky points a gun at him. But the district court correctly noted Horton takes this frame out of context. In context, the video shows Michael elevated his arm quickly to open the door while he moved toward it. In any event, "[n]ot all surrenders, however, are genuine, and the police are entitled to err on the side of caution when faced with an uncertain or threatening situation." *Johnson v. Scott*, 576 F.3d 658, 659 (7th Cir. 2009). No reasonable jury would conclude the shooting was unreasonable on the basis of the footage frame when viewed in context.

Horton also argued below, and on appeal, that Pobjecky never gave any warnings before shooting. But the district court correctly observed that *Garner* requires an officer to warn "where feasible" but does not require an officer to warn under all circumstances. *Garner*, 471 U.S. at 11–12. Given the desperate circumstances Pobjecky faced, and the limited time he had, no reasonable juror could conclude he should have stopped to identify his office or warn the assailants before shooting them to defend himself and others.

Horton argues we cannot justify the shooting based on the goal of preventing escape because Pobjecky testified he did not think Michael was fleeing. But even if Pobjecky subjectively did not intend to prevent Michael from escaping by shooting him, that does not mean it was objectively unreasonable to shoot Michael to prevent him from escaping. The video shows Michael moving toward the exit as Pobjecky shoots him. Even if Michael had already crawled past Pobjecky, it was still reasonable for Pobjecky to shoot him in the back to prevent escape. Moreover, the goals of self-defense and defense of others remained valid even after Michael crawled past Pobjecky because for all a reasonable officer could have known Michael could have turned and produced a gun in a flash given all the facts and circumstances. In sum, even if Pobjecky only shot Michael in the back as he crawled away, this shooting would still have constituted a reasonable prevention of escape, despite Pobjecky's testimony, and this shooting would still have constituted a reasonable act in defense of self and others.

Horton argues we cannot justify the shooting based on the goals of self-defense or defense of others because the evidence viewed in his favor shows Michael did not pose an imminent

threat of death or serious physical injury to anyone. Horton argues that if Michael were inclined to harm anyone, and were capable of doing so, he would have done so before he was shot. Horton also argues Pobjecky did not perceive Michael to be a threat because he was "so unconcerned" about Michael that he turned his back to Michael, who was only a few feet away, before shooting him. We disagree. What matters is whether a reasonable officer on the scene would have perceived Michael as posing an imminent threat of death or serious physical injury. Even in the light most favorable to Horton, the answer is yes. There is no reason to think Pobjecky should have assumed Michael was harmless because if he had a gun, he would have used it sooner. A reasonable officer need not risk his life and the lives of others on such speculation. And there is no reason to think Pobjecky knew where Michael was at all times. Besides, given the varied and changing positions of the assailants after Pobjecky got hold of Tarara's gun, Pobjecky could not give his full attention to all the assailants at once. Turning toward one required turning away from another.

Horton recognizes that perhaps Pobjecky could have constitutionally shot Michael at some earlier stage of the encounter. But Horton insists that the shooting was no longer permissible after the struggle for the guns was over, Coates was neutralized, Bellmon and Brandon had left, and Michael was crawling away from Pobjecky, who never identified his office or told Michael to stop. But this ignores the totality of the circumstances. As shown in the video, during an armed robbery Michael approached Pobjecky generally from behind, in close quarters, and Pobjecky turned to confront the threat and immediately shot Michael. When he shot Michael,

Pobjecky did not know the total number of assailants, and he reasonably assumed all might be armed and dangerous.

Viewing the facts and drawing inferences in Horton's favor, and considering the totality of the circumstances, we agree that the four assailants placed the lives of Pobjecky and others in objectively grave danger, and that Pobjecky's response with deadly force was reasonable. Michael participated in an armed robbery. After approaching (although not directly participating in) a struggle for a loaded gun, Michael advanced toward Pobjecky generally from behind, in close quarters, as other assailants occupied various positions. Pobjecky immediately shot him.

Pobjecky objectively had reason to think Michael was armed and dangerous, and posed an imminent threat of death or serious bodily harm to Pobjecky and the community. Under immense pressure, and with limited time, Pobjecky responded to the armed siege with reasonable, appropriate, and justified force, in compliance with the Fourth Amendment. No reasonable jury could find otherwise. Michael's death is deeply regrettable. It is tragic. But the tragic flaw rests with the assailants, not with Pobjecky.

## B. Failure to Provide Medical Care

Michael lived briefly after the shooting. Horton claims Michael might have survived had he received medical care sooner. Horton argues Michael's wounds might have been survivable without treatment for five to forty minutes. Horton notes paramedics arrived only four minutes after Weidner's 911 call, but Weidner did not make that call until seven minutes after Pobjecky shot Michael. Horton argues that had Pobjecky called 911 within a minute after shooting

Michael, the paramedics could have arrived early enough to save Michael's life, or at least to alleviate his excruciating pain. As it happened, the paramedics arrived eleven minutes after Pobjecky shot Michael, which was too late to save him.

The Fourth Amendment's objective reasonableness standard applies here, too. *Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 503 (7th Cir. 2010). Horton had to show Pobjecky's response to Michael's medical needs was objectively unreasonable, and that Pobjecky's response caused harm. *Ortiz v. City of Chi.*, 656 F.3d 523, 530 (7th Cir. 2011).

The district court considered the four-factor reasonableness test articulated in *Ortiz*, found no constitutional violation, and granted summary judgment to Defendants. *Ortiz* provides four factors to determine whether an officer's actions regarding medical care were objectively unreasonable: (1) whether the officer had notice of the medical needs; (2) the seriousness of the medical needs; (3) the scope of the requested treatment; and (4) police interests that might inhibit providing treatment. *Ortiz*, 656 F.3d at 530. "[T]he Fourth Amendment's reasonableness analysis operates on a sliding scale, balancing the seriousness of the medical need with the third factor—the scope of the requested treatment." *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007).

As the district court recognized, in the light most favorable to Horton, Pobjecky knew Michael had serious medical needs. But the third and fourth factors outweigh the first and second. Pobjecky reasonably feared for his life and the lives of others. After exhausting his ammunition neutralizing the assailants at least temporarily, he locked the front door. He did not

know whether some assailants were regrouping or summoning reinforcements. He then did what a reasonable police officer in that situation would do: he instructed Tarara to call 911. Tarara had trouble getting through, so Weidner called. Pobjecky also called a dispatcher on his direct line. The record shows 911 received a call at 10:34 p.m. reporting an armed robbery and injuries from gunshots, and the first responders arrived at the scene at 10:38 p.m.

The law does not require, and Horton cannot expect, Pobjecky to do anything more. It was objectively reasonable for Pobjecky to stay inside the locked pizzeria awaiting help. It is objectively unreasonable to demand him to venture into the night with an empty gun, risking further onslaught, braving the hazards Michael and the other assailants created, to administer treatment to Michael. The district court properly concluded a reasonable jury could not find Pobjecky should have unlocked the door, exited, and provided medical care. Pobjecky did not violate the Constitution.

### *C.* Monell *Claim*

Horton also brought a *Monell* claim against the Sheriff, claiming deficiencies in the policies, procedures, customs, and practices of the Sheriff caused the shooting of Michael. The district court properly granted summary judgment for the Sheriff regarding the *Monell* claim predicated on excessive force because Pobjecky did not use excessive force. The district court also noted that any *Monell* claim predicated on failure to provide medical care would also fail because Pobjecky did not violate the Constitution in this regard either. "[A] municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee." *Sallenger*, 630 F.3d at 504.

As we affirm the district court's grant of summary judgment for Pobjecky regarding the claims for excessive force and failure to provide medical care, we also affirm the district court's grant of summary judgment regarding the *Monell* claim.

### D. State-Law Claims

Horton also brought one claim under the Illinois Wrongful Death Act and two claims under the Illinois Survival Act against Pobjecky and the Sheriff. After granting Defendants summary judgment regarding the federal claims, the district court chose not to relinquish supplemental jurisdiction over the state-law claims.

Pobjecky and the Sheriff claimed immunity against the state-law claims pursuant to the Illinois Local Government and Governmental Employees Tort Immunity Act, which grants public employees immunity from liability for any "act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202. The district court correctly concluded that since Pobjecky's actions were objectively reasonable, they cannot be willful and wanton, so Defendants were entitled to immunity, and the state-law claims failed.

### IV. Conclusion

Even in the light most favorable to Horton, Officer Pobjecky acted reasonably when confronted with a perilous, life-threatening situation. He did not violate the Constitution. We affirm the district court.

AFFIRMED.