In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-1435

RACHEL YBARRA, as Special Administrator of the Estate of
RAFAEL CRUZ, deceased,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 16-cv-08009 — **Virginia M. Kendall**, *Judge.*

ARGUED DECEMBER 4, 2019 — DECIDED JANUARY 3, 2020

Before FLAUM, RIPPLE, and HAMILTON, *Circuit Judges.*

FLAUM, *Circuit Judge.* Rachel Ybarra brought a lawsuit
against the City of Chicago and Chicago Police Department
Commander Francis Valadez and Officer Monica Reyes for
excessive force and wrongful death based on the shooting
death of her son, Rafael Cruz. The district court entered sum-
mary judgment for the defendants, holding that the officers
could have reasonably believed, based on Cruz's involvement

in a drive-by shooting and extremely reckless driving, that Cruz posed an imminent threat to others if allowed to escape from the parking lot where they shot him.

We affirm. Under the circumstances present in this case, the officers had probable cause to believe that Cruz posed a threat of serious physical harm to others in the immediate vicinity. It was therefore not unreasonable for the officers to prevent Cruz's escape by using deadly force.

## I. Background

During the early hours of August 29, 2015, Chicago Police Department Commander Francis Valadez and Officer Monica Reyes (collectively, "the officers") were in an unmarked police car patrolling a neighborhood where a gang-related shooting had recently occurred. At approximately 1:30 a.m., the officers saw a rear passenger in Rafael Cruz's Chevy Tahoe fire five gunshots at the occupants of another car. Immediately after the shooting, Cruz drove away, reaching speeds of 40 to 70 miles per hour in a 30-miles-per-hour zone. Reyes called in an emergency, reporting "shots fired" over the police radio. Valadez was driving and followed Cruz's Tahoe, which had dark, tinted windows. The officers followed Cruz's Tahoe through city streets for approximately one mile but did not activate any emergency lights or sirens on their vehicle.

With the unmarked police car still following him, Cruz turned westbound and struck a parked car on the north side of the street with enough force that it pushed the car forward into a second car parked roughly a car-length in front of it, causing the second car to roll into a third. Despite that collision, Cruz kept driving before crashing into a fourth car on

the south side of the street and coming to a stop near the entrance of a parking lot.

At that point, the officers parked their car behind Cruz's Tahoe, believing that it had stalled due to the damage it had sustained during the collisions. Valadez then began getting out of the car while announcing that he was a police officer. Almost simultaneously, Cruz put his Tahoe into reverse, forcing Valadez back into his car just before the back of the Tahoe struck the driver's side of the car. The collision forced the open driver's side door closed and caused the officers' "whole car" to "rock[]." Reyes thought that Valadez had been hit by the Tahoe and was concerned that he may have been severely injured in the seconds following the collision. Cruz then pulled forward and turned left into the parking lot.

The officers followed Cruz into the parking lot on foot, wearing plain clothes, duty belts, and bulletproof police vests that displayed their police star. Valadez ran to the south side of the parking lot, while Reyes positioned herself behind a parked car near the parking lot's entrance. Valadez testified that he shouted "police" while running into the parking lot. The parking lot was "pretty well lit" by lights in the lot and at the adjacent intersection. One of Cruz's passengers, Pasqual Nava, testified that he knew that Valadez was a police officer because he could see Valadez's vest. Reyes also yelled several times to "stop the vehicle" and "stop it." Two of Cruz's passengers, Jose Cabello and Pasqual Nava, did not hear Valadez or Reyes say anything.

Cruz did not stop and instead made a three-point turn back toward the parking lot's entrance, which was the only path for vehicles to enter or exit the parking lot. The headlights of Cruz's Tahoe shone directly at Valadez and then at

Reyes as Cruz completed his three-point turn and pulled for-
ward. Valadez initially stated that as the Tahoe began driving
forward, he saw the driver's window being lowered two to
three inches and believed that Cruz was about to begin shoot-
ing at him. Video footage, however, showed that the window
may have already been rolled down before Cruz's Tahoe en-
tered the parking lot.

As Cruz began driving forward, Valadez fired three shots
at Cruz, and Reyes immediately thereafter fired five addi-
tional shots at him. The officers continued shooting after the
Tahoe had driven past Reyes. Reyes testified that she could
see Cruz's profile as he drove past her. Reyes called out over
the radio, "Shots fired by police, shots fired by police." Cruz
died as a result of a gunshot wound.

Approximately ninety seconds elapsed from the time the
initial shots were fired from Cruz's Tahoe until Cruz was
shot, roughly sixteen of which elapsed during the encounter
in the parking lot. Surveillance footage shows that pedestri-
ans, cyclists, and other vehicles were in the area within twenty
minutes of the incident.

Ybarra, Cruz's mother and administrator for his estate,
filed suit, bringing claims against the officers for excessive
force under 42 U.S.C. § 1983 and against the officers and the
City of Chicago for wrongful death under Illinois law. The
district court entered summary judgment for the defendants,
holding that although there was a fact dispute as to whether
the officers had acted reasonably in self-defense, they had
acted reasonably in using deadly force against Cruz to protect
others in the immediate vicinity by preventing his escape.
Ybarra now appeals.

## II. Discussion

Construing all factual disputes and drawing all reasonable inferences in favor of Ybarra, we review de novo the district court's entry of summary judgment for the defendants. *Palmer v. Franz*, 928 F.3d 560, 563 (7th Cir. 2019). The defendants are entitled to summary judgment only if they have shown "that there is no genuine dispute as to any material fact" and that they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

We conclude that the officers' use of deadly force against Cruz was an objectively reasonable means to prevent the escape of armed and dangerous suspects who were driving with reckless disregard for the safety of others after firing gunshots at the occupants of another car moments earlier. "A police officer's use of deadly force on a suspect is a seizure within the meaning of the Fourth Amendment, so the force must be reasonable to be constitutional." *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). A suspect has a constitutional right not to be shot by an officer unless the officer "reasonably believes that the suspect poses a threat to the officer or someone else." *Id.* at 949 (citation and brackets omitted).

> When an officer reasonably believes an assailant's actions place him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force. An officer does not violate the Fourth Amendment by firing at a suspect when the officer reasonably believed that the suspect had committed a felony involving the threat of deadly force, was armed with a deadly weapon, and was likely to

> pose a danger of serious harm to others if not immediately apprehended.

*Id.* (internal quotation marks and citations omitted). Under some circumstances, a police officer may therefore use deadly force as a reasonable means to prevent a suspect's escape.

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985).

Application of the reasonableness test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is

necessary in a particular situation." *Id.* at 396–97; *see also Horton*, 883 F.3d at 950 (reasonableness test requires considering "the pressures of time and duress, and the need to make split-second decisions under intense, dangerous, uncertain, and rapidly changing circumstances"). Unlike the court, the officers "lacked [the] luxury of pausing, rewinding, and playing the videos [of the incident] over and over." *Horton*, 883 F.3d at 950.

"[O]utrageously reckless driving" that "pose[s] a grave public safety risk" can be enough to justify the use of deadly force under some circumstances. *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014) (reversing denial of summary judgment for officers who shot at fleeing suspect to end car chase); *see also Scott v. Edinburg*, 346 F.3d 752, 758–61 (7th Cir. 2003) (affirming summary judgment for defendants where officer shot at fleeing suspect who had stolen car and put others in vicinity at risk through dangerous driving). Here, there was more than Cruz's extremely reckless driving to support the officers' conclusion that Cruz presented a grave public safety risk.

Cruz was not merely an impaired driver or someone driving away from a traffic ticket. After someone in his Tahoe fired multiple shots at another vehicle, Cruz sped away through city streets at roughly twice the speed limit, driving for a mile before crashing into multiple cars. First, he careened into a parked car with such force that it pushed the car forward into a second car parked a full car-length in front of it, which then rolled into a third. Despite the severity of that initial collision, Cruz did not stop. Cruz kept driving and crashed into a fourth car parked on the opposite side of the street. Then, when Valadez parked behind Cruz's Tahoe, Cruz drove backward directly into the same car door from

which Valadez was attempting to exit. Cruz's Tahoe crashed into the unmarked police car with enough force that it slammed Valadez's door shut, caused the "whole car" to "rock[]," and led Reyes to believe that Valadez may have been seriously injured.

During the encounter in the parking lot moments later, the officers reasonably believed that there was still at least one gun in Cruz's Tahoe, that Cruz could access it, and that all of the suspects in the Tahoe might have been armed and dangerous. *Cf. Horton*, 883 F.3d at 952 (holding that officer reasonably assumed decedent was armed because of decedent's participation in armed robbery). The situation was particularly difficult given that the officers could not see into the Tahoe to determine which occupant had the gun because the Tahoe had dark, tinted windows. *Cf. Ford v. Childers*, 855 F.2d 1271, 1275 (7th Cir. 1988) ("Even though [the officer] did not actually see a weapon in the suspect's hand (a post obstructed his view of the suspect's hand), given the information he possessed at that particular time and the observations he made, [the officer] reasonably concluded that the suspect was armed and dangerous."). Moreover, only sixteen seconds elapsed from when Valadez entered the parking lot (with Reyes trailing by a few seconds) until the Tahoe exited the parking lot, at which time Cruz had already been shot. Within that sixteen-second window, the officers had mere seconds to determine how to respond, and that determination was informed by the violent acts the officers had witnessed less than ninety seconds previously.

Furthermore, it was reasonable for the officers to conclude that Cruz would have known that they were police officers rather than members of a rival gang. The officers entered the

parking lot, which was "pretty well lit" by lights in the parking lot and at the adjacent intersection, wearing duty belts and bulletproof vests that had their police star displayed on them. Both officers had also been illuminated by Cruz's headlights. Indeed, Nava testified that he knew Valadez was a police officer because he could see his vest. Moreover, Valadez's testimony that he identified himself as a police officer when he initially got out of his car (before it was struck by Cruz's Tahoe) is unrebutted.

The law requires that before using deadly force to prevent escape, the officers must, "where feasible," give "some warning." *Horton*, 883 F.3d at 949 (quoting *Garner*, 471 U.S. at 11–12). The undisputed facts show that such a warning was given here. Nava testified that he was looking at Valadez immediately before Valadez began shooting, but that he never saw Valadez's mouth move and that Valadez "never said 'stop,' never said nothing." Regardless of whether Valadez yelled to "stop," however, Reyes can be heard yelling at Cruz to "stop the vehicle" in the audio recorded by her police radio. There is no requirement that every officer on a scene shout duplicative commands. To the extent that the passengers in Cruz's Tahoe could not hear the warnings, their testimony that they "did not *hear* any warnings fails to present a question of material fact as to whether the giving of the warnings was feasible and if in fact they were given." *Ford*, 855 F.2d at 1276.

Thus, when Cruz failed to stop after Reyes yelled at him to "stop the vehicle" but instead continued driving in Reyes's general direction toward the parking lot exit, the officers had probable cause, based on Cruz's involvement in the drive-by shooting and his extremely reckless driving, to believe that Cruz presented a threat of serious physical harm to others if

not immediately apprehended. Even though the encounter occurred during the very early hours of the morning, surveillance footage shows other pedestrians, cyclists, and motorists in the area around the time of the shooting.

Regardless of whether the officers reasonably believed that Cruz presented a direct threat to the officers' own safety—whether by driving toward or shooting at them— there is no genuine dispute of material fact that the officers acted reasonably in using deadly force against Cruz to prevent his escape to protect others in the immediate vicinity. *See Scott*, 346 F.3d at 759 ("[T]he threatened individuals need not have been placed in the direct path of the threat. Deadly force may be exercised if the suspect's actions place the officer, his partner, or those in the *immediate vicinity* in imminent danger of death or serious bodily injury." (citation and internal quotation marks omitted)). Their use of deadly force to prevent escape continued to be reasonable even as Cruz drove past the officers. *Cf. Horton*, 883 F.3d at 952 ("Even if [a participant in an armed robbery] had already crawled past [the officer], it was still reasonable for [the officer] to shoot him in the back to prevent escape.").

For the same reasons that the officers' use of deadly force was not an unreasonable seizure under the Fourth Amendment, their use of deadly force was justified under Illinois law. *See Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002) ("The same [reasonable use of deadly force] rule applies to [plaintiff's] wrongful death claim under Illinois

law.").[1] And under 745 Ill. Comp. Stat. 10/2-109, the City cannot be held vicariously liable when its individual officers are not liable. The defendants are therefore entitled to summary judgment on both the § 1983 claim and the wrongful death claim under Illinois law.

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

[1] Under 720 Ill. Comp. Stat. 5/7-5, an officer is justified in the use of deadly force in Illinois if:

> [H]e reasonably believes that such force is necessary to prevent death or great bodily harm to himself or such other person, or when he reasonably believes both that:
>
> > (1) Such force is necessary to prevent the arrest from being defeated by resistance or escape; and
> >
> > (2) The person to be arrested has committed or attempted a forcible felony which involves the infliction or threatened infliction of great bodily harm or is attempting to escape by use of a deadly weapon, or otherwise indicates that he will endanger human life or inflict great bodily harm unless arrested without delay.

Moreover, the Illinois Tort Immunity Act provides that a "public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 Ill. Comp. Stat. 10/2-202. For the same reasons that the officers' use of deadly force was reasonable as a matter of law, a jury could not conclude that their use of deadly force was willful and wanton.

HAMILTON, *Circuit Judge*, concurring in the judgment. I would affirm summary judgment on the narrower ground of qualified immunity on plaintiff's Fourth Amendment claim. In briefing in this court, plaintiff effectively conceded that qualified immunity is appropriate. She described this case as straddling the "hazy border" between reasonable and unreasonable force. Appellant's Reply Br. at 6. I agree, and we could and should stop there. See generally *Pearson v. Callahan*, 555 U.S. 223, 241 (2009), citing among others *Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring). I would not make my colleagues' further finding that the officers did not violate the Fourth Amendment, particularly in light of the officers' use of deadly force while driving an unmarked vehicle and wearing plain clothes.

Driving the Tahoe when his passenger fired shots at another car, Cruz then fled recklessly from the shooting and from another car, the unmarked police car, that was chasing him at night. Under *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985), the Fourth Amendment generally permits police to use deadly force to prevent the escape of a suspect fleeing from such a violent crime, with the proviso that a warning should be given "if feasible." We expect officers if feasible to give civilians a choice between surrender and death.

The extensive case law concerning police use of force, and especially deadly force in police chases, almost always involves uniformed police officers and clearly marked police vehicles. Courts expect civilians to comply with police commands and warnings and to respect the authority of the police. Those expectations do not necessarily apply to police officers who are out of uniform in unmarked vehicles, however effective those tactics may be for particular police purposes.

The officers here were in plain clothes, not in uniform, and they were driving an unmarked car. Never in the ninety-second episode did the officers use the car's hidden emergency lights or sirens. In reviewing a grant of summary judgment, we cannot assume Cruz knew he was being pursued by police officers during the chase or even during the fatal confrontation in the church parking lot. One passenger in Cruz's car recognized from their gear that the people on foot in the parking lot were in fact police officers. Cruz and others may not have. The evidence of shouted warnings did not show beyond reasonable dispute that the officers could reasonably have expected the Tahoe's driver to have heard them.

We explained in *Doornbos v. City of Chicago*, 868 F.3d 572, 585 (7th Cir. 2017), that with only rare exceptions, plainclothes officers may not initiate Fourth Amendment seizures without identifying themselves as police: "many civilians who would peaceably comply with a police officer's order will understandably be ready to resist or flee when accosted—let alone grabbed—by an unidentified person who is not in a police officer's uniform." In *Doornbos*, we also summarized the special dangers posed by the use of force by plainclothes officers as reported in the U.S. Department of Justice's investigations of the police departments in Chicago and other cities, highlighting Chicago's "aggressive plainclothes policing practices that result in needless injuries." *Id*. at 586–88 & n.4. There have been too many tragedies around the nation in which police officers have used deadly force against their own colleagues in plain clothes, often officers of color, in circumstances that

were "tense, uncertain, and rapidly evolving," to quote *Graham v. Connor*, 490 U.S. 386, 396 (1989).[1]

---

[1] One study sponsored by the National Law Enforcement Officers Memorial Fund and the Department of Justice identified 105 cases of intentional but mistaken shootings of officers by other officers, "many times" involving the intervention of plainclothes or off-duty officers. Nick Breul & Desiree Luongo, *Making It Safer* 64–66 (2017), https://cops.usdoj.gov/RIC/Publications/cops-w0858-pub.pdf. A New York state task force addressed the "special fear" experienced by officers of color encountering white officers while "out of uniform—off-duty, undercover, or in plainclothes." *Reducing Inherent Danger* 1, N.Y. State Task Force on Police-on-Police Shootings (2010), https://www.hks.harvard.edu/sites/default/files/centers/wiener/programs/pcj/files/Police-on-Police_Shootings_with_appendices.pdf. See also, e.g., Michael Wilson, Ali Watkins & Ali Winston, "*Friendly Fire" Killing of Detective: 42 Shots, 7 Officers, 11 Seconds*, N.Y. Times (Feb. 13, 2019), https://www.nytimes.com/2019/02/13/nyregion/nypd-cop-killed.html; WWJ, *Detroit Cops Fight Each Other in "Embarrassing" Undercover Mix-Up*, CBS Detroit (Nov. 13, 2017), https://detroit.cbslocal.com/2017/11/13/detroit-police-undercover-mix-up; Associated Press, *Black St. Louis Police Officer Shot by White Colleague "Fearing for His Safety"*, The Guardian (June 24, 2017), https://www.theguardian.com/us-news/2017/jun/24/black-st-louis-police-officer-shot-white-colleague; Matt Howerton, *Cop Who Shot Fellow Officer: I Didn't Know It Was You*, KOAT (Apr. 1, 2016), https://www.koat.com/article/cop-who-shot-fellow-officer-i-didn-t-know-it-was-you/5070698; Meghan Keneally & Emily Shapiro, *Maryland Cop Mistook Plainclothes Officer as "Threat" During Fatal Shooting*, ABC News (Mar. 16, 2016), https://abcnews.go.com/US/maryland-cop-mistook-plainclothes-officer-threat-fatal-shooting/story?id=37699834; CBS & AP, *Report Finds BART Cop Accidentally Shot, Killed Fellow Officer on Duty*, CBS San Francisco (May 30, 2014), https://sanfrancisco.cbslocal.com/2014/05/30/report-finds-bart-cop-accidentally-shot-killed-fellow-officer-on-duty; Ann Mercogliano & Alice McQuillan, *MTA Officer Who Shot Nassau Cop Is "Devastated"*, NBC N.Y. (Mar. 12, 2011), https://www.nbcnewyork.com/news/local/nassau-county-police-officer-killed/1939873.

Nevertheless, despite some factual disputes bearing on the ultimate reasonableness of the officers' actions in this case, I would affirm summary judgment for the officers based on the doctrine of qualified immunity. As noted, plaintiff concedes that the officers' conduct falls somewhere on the "hazy" borderline separating excessive and appropriate force. See *Saucier v. Katz*, 533 U.S. 194, 206 (2001), abrogated in nonrelevant part by *Pearson*, 555 U.S. at 227. And even if that were not so, plaintiff's briefs failed to identify "a body of relevant case law" rendering the officers' conduct clearly unconstitutional on the facts construed most favorably to her, and failed as well to persuade that this is an "obvious" case controlled directly by *Garner* and *Graham*. See *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004). We should take the more conservative decisional route here by limiting our holding to the qualified immunity defense.