In the

# United States Court of Appeals
## For the Seventh Circuit

No. 19-1471

REBECCA GYSAN, individually and as executor of the estate of
Shane Cataline,

*Plaintiff-Appellant*,

*v.*

STEVEN FRANCISKO and MARC MILLER, Director of the Illinois
Department of Natural Resources,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 16-cv-8254 — **Jorge L. Alonso**, *Judge*.

ARGUED JANUARY 9, 2020 — DECIDED JULY 13, 2020

Before EASTERBROOK, WOOD, and BARRETT, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. On the first day of deer-hunting season in 2013, Officer Steven Francisko was checking hunters' licenses to prevent poaching. He saw a van parked on the side of a road; immediately across the road, armed hunters had just emerged from the woods. Francisko approached the driver, who turned out to be Shane Cataline.

Francisko thought that Cataline was acting strangely and was reluctant to answer questions, though he handed Francisko his driver's license. While Francisko was in his car doing a license check, Cataline called 911 and said: "I am in a lot of trouble right now. … I think I am going to be disappearing or something." He hung up without requesting assistance. Francisko found that Cataline's license was valid and that he was not wanted on a warrant, so he told Cataline that he was free to go—though he thought that Cataline looked tired.

By the time Cataline drove away, Francisko had been joined by State Trooper Luke Kuehl in a second car. The 911 operator, worried about the strangeness of Cataline's statements, called back, but he did not answer. The operator called the dispatcher, who reached Kuehl's supervisor, who told him to stop Cataline to check whether he was fit to drive. (Everyone calls this a "welfare check," meaning that it concerned the welfare of both Cataline and other drivers he might endanger.) Meanwhile Francisko had told Kuehl that he suspected that Cataline might be carrying drugs. The two officers followed Cataline's van onto the eastbound lanes of I-88 and eventually pulled it over, though they took a while to see whether he violated any traffic laws that might support a stop.

Cataline stopped his van on the side of the highway after Kuehl turned on his flashing lights. Kuehl parked his car behind the van, and Francisko parked in front. The officers asked Cataline to put the van in park, turn off the engine, and hand over the keys. He did none of these things and stared straight ahead. Told that the officers wanted to ask about the 911 call, Cataline ignored them and continued to

look ahead. Again, and then a third time, they told Cataline to turn off the engine. He did not comply. Instead he put the van into reverse, obtained enough room to turn 180°, and pointed the van west in the eastbound lanes of the Interstate. Francisko, who had to jump out of the way to avoid being hit, started trying to warn approaching traffic. Cataline then made a further 90° turn and plowed the van into the side of Kuehl's car, bending its open door forward (the wrong way) on the hinge. Kuehl and Francisko say that Kuehl was pinned behind the door.

A dashboard camera on Kuehl's car was pointed straight ahead and recorded the van making the first 180° turn, but that maneuver took it out of the field of view. The audio portion of the recording continued, however, and the sound of the collision is followed by the sound of the van's engine running and tires spinning after the crash, plus the voice of someone screaming. Francisko jumped onto the hood of Kuehl's car and shot Cataline, who died at the scene. The video continued, and Kuehl can be seen limping.

Rebecca Gysan, Cataline's mother and the executor of his estate, filed this suit under 42 U.S.C. §1983. She contended that the police thrice violated the Fourth Amendment (applied to the states by the Fourteenth): first by asking questions while Cataline's van was stopped, next by directing Cataline to stop driving while his van was moving, and finally by shooting him. The district court granted summary judgment to both defendants—Francisko and Marc Miller, director of the state agency that employed Francisko. 2019 U.S. Dist. LEXIS 23805 (N.D. Ill. Feb. 14, 2019).

The judge rejected the first two theories on the merits and the third after concluding that Francisko is entitled to quali-

fied immunity because existing precedent would not have made clear to all reasonable officers that the use of deadly force was forbidden. On appeal Gysan has abandoned any claim based on the initial encounter between Francisko and Cataline, and her brief does not so much as mention Miller. Our discussion is limited to the remaining theories.

We start with the shooting. Gysan proceeds as if showing that the van should not have been stopped would be enough to demonstrate that Francisko could not lawfully have shot Cataline. Doubtless the stop was one step in the causal chain leading to Cataline's death, but an improper stop would not demonstrate that Francisko used excessive force under the circumstances that he faced after the stop occurred. *Los Angeles v. Mendez*, 137 S. Ct. 1539 (2017), holds that officers who make errors that lead to a dangerous situation retain the ability to defend themselves. We therefore put aside (for now) the question whether the officers should have stopped Cataline and ask whether it was clearly established that the Constitution forbade the use of deadly force under the circumstances that ensued.

Whether it is "clearly established" that the official conduct is forbidden is the principal issue when a defendant asserts qualified immunity. See, e.g., *Escondido v. Emmons*, 139 S. Ct. 500 (2019). And few propositions are as well established in *favor* of police officers as that they are entitled to use deadly force to protect themselves or the public from an imminent threat of serious harm. See, e.g., *Tennessee v. Garner*, 471 U.S. 1 (1985). *Mendez* and *Emmons* discuss many of these decisions. Recent opinions in this circuit illustrate the point. *King v. Hendricks County Commissioners*, 954 F.3d 981 (7th Cir. 2020), holds that police who shot a person who

charged them with a knife were entitled to qualified immunity, and *Ybarra v. Chicago*, 946 F.3d 975 (7th Cir. 2020), holds that police did not violate the Fourth Amendment by shooting the driver of a fleeing car from which shots had recently been fired.

Gysan does not doubt that police may use deadly force to protect themselves. Instead she contends that Cataline was not a danger to them. Yet he had violated an order to turn off the engine; then he turned the van around, began to drive the wrong way on an expressway, and turned again to hit a police cruiser. All of that is undisputed.

Gysan suggests that, after smashing into Kuehl's car, Cataline may have put up his hands in surrender. That's conceivable, though we do not see how it could be proved; as in *King*, the only person in a good position to offer evidence contradicting the police account is dead. Francisko and Kuehl both testified that Kuehl was wedged behind the door and at continuing risk; again Gysan lacks contrary evidence. What objective evidence we have supports the officers: the van's engine continued to run at high speed until Francisko shot Cataline, which is inconsistent with his desisting from the attack and surrendering. Kuehl appears in the video to walk with a limp after the events, and Gysan does not deny that the voice heard screaming was Kuehl's; this supports the officers' contention that Kuehl's life was at stake. Francisko is entitled to qualified immunity.

This brings us back to the question whether the traffic stop violated the Fourth Amendment. Gysan's brief left us uncertain whether she seeks damages for the stop, independent of the shooting, but at oral argument her lawyer said that she is. The briefs do not address questions such as

whether invasion of privacy, loss of time, or the other inju-
ries from an unnecessary traffic stop survive the driver's
death and what damages, if any, an estate may pursue. *Rob-
ertson v. Wegmann*, 436 U.S. 584 (1978), holds that state sur-
vival statutes determine the answers for suits under §1983,
yet the parties' briefs do not mention how Illinois handles
these matters. Instead of exploring these issues on our own,
we stop with the question whether Cataline would have had
a good claim, had he lived. Cf. *United States v. Sineneng-
Smith*, 140 S. Ct. 1575 (2020).

Let us suppose that Francisko was looking for a pretext
that would enable him to stop the van so that he could check
for drugs. That does not matter because analysis under the
Fourth Amendment is objective. *Whren v. United States*, 517
U.S. 806 (1996), holds that as long as a stop is supported by
an objectively sufficient cause, a court must ignore the offic-
ers' motivations. So we ask whether it was reasonable to stop
Cataline's van.

The answer is yes. Cataline's behavior when initially
questioned and the odd 911 call both would have led an
officer to be concerned that he was tired or under the influ-
ence of drugs, which would have posed a danger to himself
and other drivers. After learning about the 911 call the dis-
patcher and Kuehl's supervisor both concluded that he
should stop the van and inquire about those potential prob-
lems. And when Francisko set out to find a pretext for the
stop, what he saw was consistent with concern about safety
on the road. Francisko and Kuehl testified that they saw the
van cross the white line on the right of the highway several
times. (The parties call this the fog line.) Inability to keep a
vehicle centered in the lane suggests that the driver is im-

paired. Gysan denies that the van crossed the fog line, but again that contention is unsupported by evidence. The officers' testimony is the only evidence that we will ever have about that subject. The stop was a reasonable one and compatible with the Fourth Amendment.

AFFIRMED