In the

# United States Court of Appeals

## For the Seventh Circuit

No. 21-2101

SUSAN DOXTATOR, *et al.*,

*Plaintiffs-Appellants*,

*v.*

ERIK O'BRIEN, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 19-cv-00137 — **William C. Griesbach**, *Judge*.

ARGUED FEBRUARY 23, 2022 — DECIDED JULY 12, 2022

Before SYKES, *Chief Judge*, and FLAUM and KANNE,* *Circuit Judges*.

FLAUM, *Circuit Judge*. Plaintiffs Susan Doxtator, Arlie Doxtator, and Sarah Wunderlich, in their capacities as Special Administrators of Jonathon Tubby's estate (the "Estate"), sued

---

* Circuit Judge Kanne died on June 16, 2022, and did not participate in the decision of this case, which is being resolved under 28 U.S.C. § 46(d) by a quorum of the panel.

various law enforcement entities under 42 U.S.C. § 1983 for their respective roles in the events leading to Tubby's death. On October 19, 2018, Green Bay Police Department (GBPD) officers arrested Tubby and transported him to jail for booking. Upon entering the jail's sally port (the secure entryway to the jail), however, Tubby became non-compliant, refusing to exit the squad car and concealing one hand under his shirt while threatening to "do it" if officers came any closer. The arresting officers called for backup, and Tubby was eventually forced out of the car with pepper spray after he continued to keep one hand under his shirt in a manner that, to officers on the scene, indicated he had a weapon. Even upon exiting the squad car, Tubby refused to surrender but instead rushed towards the exit in an apparent attempt to escape. When one of the officers on scene heard a "pop" that he believed to be a gunshot coming from the weapon he presumed Tubby was hiding, he discharged his firearm eight times, hitting Tubby with five shots. Soon after, Tubby was pronounced dead.

The Estate filed suit, bringing § 1983 and state common law claims against the shooting officer, various other responding officers, the City of Green Bay, Brown County, and the municipalities' law enforcement agencies. The defendants moved for summary judgment, which the district court granted. The Estate now appeals. For the following reasons, we affirm the district court's entry of summary judgment.

## I.    Background

### A.  Factual Background

Our description of the relevant facts mirrors the district court's detailed recitation and also draws from the video recordings available in the record. At approximately 7:30 PM on

October 19, 2018, Green Bay Police Department officers Colton Wernecke and his field training officer, Erik O'Brien, initiated a traffic stop of a vehicle with an unregistered license plate that had just run a red light. Instead of immediately responding to the squad car's overhead lights, siren, and spotlight, the vehicle continued driving and then pulled into the parking lot of a nearby hotel. It drove through the parking lot before eventually pulling into a parking spot. The occupants of the vehicle initially gave false identifications, but Wernecke and O'Brien were ultimately able to identify the driver as Tubby and the passenger as his aunt, Theresa Rodriguez. A records check revealed that each had active warrants out for their arrest.

O'Brien requested backup to provide cover, and another officer from GBPD, Tyler Haack, showed up. When the officers approached the vehicle, Haack observed what he believed to be marijuana, so the officers ordered Tubby and Rodriguez to exit the vehicle. O'Brien observed as Wernecke handcuffed Tubby behind his back, searched him, and placed him in the back of their squad car. Meanwhile, Haack handcuffed Rodriguez, placed her in his squad car, and left to bring her to the Brown County Jail. O'Brien and Wernecke waited in the parking lot for a tow truck to arrive and remove Tubby's vehicle.

It was approximately 7:35 PM when Wernecke placed Tubby in the squad car, handcuffed and secured by a seatbelt, but by 7:45 PM, Tubby had moved his hands under his legs, removed his seatbelt, and moved his right hand under his shirt. At around 8:10 PM, Wernecke and O'Brien drove Tubby to the Brown County Jail to be booked on his outstanding arrest warrant and on a new marijuana charge. Tubby sat

quietly, leaning forward, for the twelve minutes it took to reach the jail.

Wernecke and O'Brien drove into the sally port of the jail around 8:22 that evening, where they parked and exited the squad car to escort Tubby inside. In accordance with the jail's rules, the officers placed their gear and weapons in the trunk of the squad car before Wernecke walked around the vehicle to retrieve Tubby. When Wernecke opened the rear driver's side door, he noticed Tubby's hands were no longer behind his back but were instead balled up under his shirt. Wernecke repeatedly ordered Tubby out of the vehicle, but Tubby ignored each command.

O'Brien then came around to Wernecke's side to assist, and he too immediately noticed that Tubby had moved his hands to his front, where they were concealed under his clothes. To him, it appeared that Tubby was pressing a barrel of a gun against the inside of his shirt. When O'Brien attempted to pull Tubby's foot out of the car, Tubby stated, "Don't!" and, "I'll fucking do it." O'Brien slammed the door shut and told Wernecke, "I think he's got a gun." O'Brien then asked Wernecke what he thought, and Wernecke responded that he must have missed something in his search of Tubby's person.

The officers then alerted the jail's staff that they believed Tubby to be armed. O'Brien and Wernecke retrieved their weapons from the back of the squad car, took cover behind a nearby transport van, and radioed police dispatch for backup, reporting that "it looked like" Tubby had "something" in his hand. O'Brien later relayed to police dispatch that Tubby had something under his shirt pointed up to his chin and requested that an officer bring a shield for their protection.

Starting at 8:30 PM, other officers, from both GBPD and the Brown County Sheriff's Office (BCSO), began to arrive on-scene. Among them was GBPD Lieutenant Nate Allen, the supervisor on duty that night, who spoke with the department's SWAT commander to develop a plan for removing Tubby from the squad car. They decided that Allen would drive a Bearcat, an armored SWAT vehicle, up near the squad car and that a team of officers with shields would open the rear door and command Tubby to exit the vehicle. If he did not comply, they would deploy a K-9 unit to pull him out. The plan changed, however, when Lieutenant Thomas Zeigle, the commander of the BCSO SWAT team, arrived and asserted his jurisdiction over the situation. He determined that official activation of a SWAT team was unnecessary given the number of officers, including SWAT-trained officers, already on scene. Instead, Zeigle decided they would first break the back window of the squad car to establish better communication with and visibility of Tubby. If they couldn't coax him out of the vehicle with words, Zeigle decided they would then deploy pepper spray to get a reaction from Tubby and possibly force him out of the vehicle and into the open, where he would likely surrender.

The officers settled on this plan and began to set it into motion. One group of officers formed an arrest team, another spread out along the perimeter of the sally port's open door to prevent Tubby from escaping, and another piled into the Bearcat vehicle. At approximately 9:02 PM, the Bearcat moved into position, pulling up next to the driver's side of the squad car. While this was happening, Tubby appeared to put something in his mouth through his shirt, and he said, "I'll fucking do it." Shortly after this, Tubby turned towards the back window and repeated, "I'll fucking do it."

At approximately 9:06 PM, Officer Eric Allen of GBPD stood up through the top of the Bearcat's turret and fired a 44-millimeter wooden dowel into the rear windshield of the squad car. Part of the window shattered, and Tubby recoiled, saying, "Fuck you." Allen then said, "Jonathon, put your hands up where I can see them," and, "Jonathon, put your hands up." Tubby maneuvered himself into the corner of the squad car and began crying. He yelled, "Okay!" and then said, "What are you guys doing to me?" Shortly after that, he said, "Help me," and "I'm scared," though he never showed both of his hands to the officers.

To get a better view into the backseat of the squad car, Officer Allen fired a second wooden dowel into the window, and then another officer in the Bearcat used a tool to break out the remaining pieces of the windshield. At this point, Allen had a better view into the car, and he believed he saw Tubby facing the now-broken rear windshield with his hands still tucked under his shirt, holding something under his chin. Allen made repeated commands to Tubby to put his hands up, but Tubby ignored each one. Around 9:09 PM, Allen used a loudspeaker from the Bearcat to tell Tubby, "Jonathon, put your hands up." Tubby did not comply but responded, "What are you guys doing to me?" Allen then implored Tubby to obey their commands, saying, "Jonathon, put your hands up, bud, so I can see them. Come on, Jonathon. Jonathon, we don't want to hurt you. Put your hands up, bud. Come on, Jonathon." But, still, Tubby refused to comply and kept at least one of his hands concealed under his shirt.

Allen, however, did not give up. At one point, he saw that Tubby's left hand was empty and outside of his shirt. When Jonathon looked out the rear window, Allen said, "Jonathon,

put your hands up for me, bud. Put your hands up for me Jonathon. I can see that one is clear. Let me see your other hand. Let me see your other hand, bud." Still, Tubby refused to comply.

Less than a minute later, someone in the Bearcat handed a canister of pepper spray up to Allen, and, without warning Tubby, Allen deployed some of it into the rear of the squad car.

Tubby began yelling and bouncing up and down in the rear seat. He then scrambled out of the rear windshield and onto the closed trunk of the squad car. He stood up and faced out towards the officers, but he kept his right hand concealed under his shirt. Unable to determine whether he was hiding a weapon under his shirt, one officer, Sergeant Thomas Denney, fired a bean bag, which struck Tubby in the lower abdomen and caused him to fall off the trunk of the squad car and onto the ground. Tubby quickly rose to his feet and moved towards the open sally port door, where several officers—including Officer O'Brien—were standing.

While this was happening, another officer released the K9 unit, Pyro, from the Bearcat on a 15-foot lead, and the dog closed in on Tubby as he was making his way towards the sally port entrance. Pyro locked onto Tubby's rear-end, and the officer controlling Pyro pulled back on the lead to keep Tubby from advancing towards the sally port entrance. Video recorded from a squad car parked outside of the sally port shows officers scattering to find cover as this was transpiring. Sergeant Denney fired another beanbag round at Tubby, causing him to fall to the ground. While he was falling, his right hand fell above his head, empty. Then, as Pyro pulled Tubby backwards, O'Brien heard a "pop" and fired his gun

eight times, striking Tubby with five of those rounds. All told, approximately ten seconds passed between Tubby exiting the squad car via the rear windshield and O'Brien shooting him.

When Tubby was down, officers rushed in to subdue him and found that he was unarmed. They called for medical assistance, and nurses administered first aid in an attempt to save Tubby's life. Tubby was pronounced dead at the scene. The medical examiner later concluded his cause of death was the gunshot wounds he sustained from O'Brien.

### B.  Procedural Background

Following Tubby's death, the Estate filed suit, raising the following list of claims: Count 1, § 1983 excessive force claim against Officer O'Brien; Count 2, § 1983 failure-to-intervene claim against Deputy Mleziva, Deputy Winisterfer, and John Does; Count 3, § 1983 failure-to-train claim against Chief Smith, Sheriff Delain, BCSO Captain Heidi Michel, the City of Green Bay, and Brown County; Count 4, § 1983 excessive force claim against City of Green Bay; Count 5, state-created danger claim against Lieutenant Zeigle, Brown County, and the city Green Bay; Count 6, battery against Officer O'Brien; Count 7, negligence against Officer O'Brien, the City of Green Bay, and Brown County; Count 8, negligence against Lieutenant Zeigle, the City of Green Bay, and Brown County. The Estate sought monetary and injunctive relief.

The district court dismissed all of the Estate's claims on summary judgment. It concluded that no reasonable jury could conclude that O'Brien's decision to fire his gun was unreasonable given the circumstances as he understood them at the time, and, for this reason, it dismissed the § 1983 claim. It further held that even if O'Brien's use of force was

unreasonable, qualified immunity barred the Estate's suit against him. With regard to the failure-to-intervene and failure-to-train claims, the district court dismissed the claims on the grounds that the underlying excessive force claim lacked merit. The district court dismissed the state-created danger claim because, it held, the doctrine did not apply to situations where the harm suffered by the plaintiff was caused directly by the state, rather than a private actor. In such situations, the district court reasoned, § 1983 is the appropriate vehicle for seeking relief. And, finally, given the dismissal of all the claims over which it had original jurisdiction, the district court declined to exercise supplemental jurisdiction over the remaining state law claims. The Estate now appeals.

## II.    Discussion

We review summary judgment rulings de novo. *Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005). "Summary judgment is warranted when the evidence, when viewed in a light most favorable to the non-moving party, presents 'no genuine issue as to any material fact' such that 'the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (citations omitted).

The district court took a domino-like approach to dismissing the Estate's case in its entirety: When the § 1983 claim against O'Brien fell, the failure-to-train and failure-to-intervene claims based on O'Brien's actions also fell, which, in conjunction with the dismissal of the state-created danger claim,

caused the state law claims to fall (albeit only to state court). We analyze the claims in this same order, beginning with the § 1983 claim against O'Brien.

### A. The Estate's § 1983 Claim Against O'Brien

The Estate's primary cause of action is its claim under § 1983 against O'Brien alleging use of excessive force. Defendants assert summary judgment was proper on this claim because the Estate cannot show O'Brien's use of deadly force was unreasonable. In the alternative, they argue that even if the use of deadly force was unreasonable, O'Brien is entitled to qualified immunity.

After reviewing the tragic events leading to Tubby's death, we hold that O'Brien's conduct was reasonable under the circumstances and that, even if he had violated a constitutional right belonging to Tubby, it was not a clearly established right. As such, we conclude that there was no constitutional violation and that, even if there were, qualified immunity would shield O'Brien from suit.

### 1. Did O'Brien Violate a Constitutional Right Belonging to Tubby?

In broad terms, § 1983 authorizes suits against government officials who violate a person's constitutional rights. 42 U.S.C. § 1983. "A police officer's use of deadly force on a suspect is a seizure within the meaning of the Fourth Amendment," so an unreasonable seizure is a violation of the Fourth Amendment cognizable under § 1983. *Ybarra v. City of Chi.*, 946 F.3d 975, 978 (7th Cir. 2020) (quoting *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018)); *see Graham v. Connor*, 490 U.S. 386, 394 (1989). "[A]ll claims that law enforcement officers have used excessive force … should be analyzed under the

Fourth Amendment and its 'reasonableness' standard ...." *Graham*, 490 U.S. at 395 (emphasis omitted). This reasonableness standard is objective, in the sense that it is the facts and circumstances presented to the officer at the time of the conduct at issue, rather than the officer's subjective intent, that matter. *Horton*, 883 F.3d at 950.

With regard to the use of deadly force, the Supreme Court has clarified:

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon ..., deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985); *see also Ybarra*, 946 F.3d at 978 ("A suspect has a constitutional right not to be shot by an officer unless the officer 'reasonably believes that the suspect poses a threat to the officer or someone else.'" (quoting *Horton*, 883 F.3d at 948)).

In evaluating whether an officer used excessive force, we are wary of hindsight bias and acknowledge the real challenges that officers regularly face on the job. *Graham*, 490 U.S. at 396–97. These challenges often turn dangerous, calling for "split-second judgments" to safeguard both the public and the responding officers "in tense, uncertain, and rapidly evolving" circumstances. *Id.* at 397. We remain mindful that the opportunity to debate the merits of various law

enforcement responses "in the peace of a judge's chambers" is a privilege unavailable to most officers in real time. *Id.*

With all of this in mind, we turn to back to the events that played out in the sally port on the evening of October 19. Even viewing them in the light most favorable to the Estate, we conclude that no reasonable jury could find O'Brien's conduct unreasonable under the circumstances.

First and foremost, Tubby intentionally led the officers to believe he was armed by keeping his hand concealed under his shirt in a manner that imitated the shape of a gun, and he threatened repeatedly to "do it" as officers attempted to persuade him to surrender. By doing so, he effectively escalated the situation into an armed standoff between himself and police. Furthermore, even when he eventually did exit the squad car after being forced out with pepper spray, Tubby did not surrender. Instead, even after he was hit with a bean bag round, he stood up and ran towards the exit and the group of officers standing thereby. Given that Tubby was undeterred by the officers' attempts to subdue him via less forceful means and given that Tubby himself seemed to be intentionally communicating to the officers that he was armed and not afraid to "do it," it was reasonable for O'Brien to deploy deadly force as Tubby rushed towards the exit and the nearby officers.

The Estate argues that O'Brien and the other officers should have known that Tubby was unarmed because Officer Wernecke had already searched him before placing him handcuffed in the back of the squad car. But by the time the officers reached the sally port and opened the door to let Tubby out, he had squirmed his handcuffed hands from behind his back. It would have been reasonable for O'Brien and

Wernecke to infer that Tubby had done this with a particular goal in mind—for instance, to retrieve a weapon Wernecke had not found on Tubby's person or one that was laying in the back of the squad car. In short, the fact that Tubby had wriggled his handcuffed hands under his feet and then began acting like he was concealing a weapon under his shirt was more than enough to justify O'Brien's belief that he was armed, notwithstanding Wernecke's earlier search.

Moreover, the record makes crystal clear that the officers honestly believed that Tubby was armed. Though the reasonableness inquiry under the Fourth Amendment is objective—and therefore subjective intentions and beliefs do not matter—the fact that so many officers all acted in accordance with the idea that Tubby was armed lends credence to the reasonableness of the belief that he was indeed armed. The veracity of this belief appears in many forms. First, O'Brien's immediate comment to Wernecke upon slamming the squad door shut after they attempted to get Tubby out was: "I think he's got a gun." The pair then proceeded to call in SWAT-trained personnel, who attempted to interact with Tubby only from the turret of an armored vehicle. And when Tubby finally exited the back of the squad car and rushed towards the sally port exit, video evidence shows Wernecke—the very officer who had originally searched Tubby at the time of his arrest—jumping over a wall for cover. At the same time, many other officers can be seen scrambling for cover with hands on their weapons. These are not the actions of officers who believe a suspect to be unarmed.

The Estate also repeatedly claims that Tubby was "subdued" at the time O'Brien shot him, because he was "handcuffed, blinded, face-down on the ground, and being attacked

by a police canine." This, the Estate argues, makes O'Brien's decision to shoot unreasonable. We carefully reviewed the record and could find no clear video showing how Tubby was positioned when O'Brien shot him. The autopsy photos are consistent with his being shot while in a prone position, however, and the Estate's expert testified that the abrasions on his chin were sustained pre-mortem, indicating he may have fallen to the ground before being shot. Viewing all facts in the light most favorable to the Estate, we must accept the Estate's contention that Tubby was face-down on the ground at the time O'Brien shot him.

Even so, however, we conclude that no reasonable jury could find O'Brien's decision unreasonable under the circumstances. First, being on one's stomach on the ground does not preclude one from firing a gun, so the fact that he was face-down on the ground and handcuffed does not render him "subdued," especially if officers believed that one of his hands contained a firearm. Additionally, by the time he was shot, Tubby had thwarted all other attempts officers had made to subdue him. These included: handcuffing him, spraying him with pepper spray, firing two bean bag rounds at him, and releasing a canine unit to apprehend him. Even after all of these measures, Tubby continued to rush towards the sally port exit and the officers guarding it. So, although Tubby was on the ground at the time O'Brien fired his gun in response to what he believed to be a gunshot, it was reasonable for O'Brien to believe that Tubby was not in fact subdued and would imminently get back up to his feet to rush for the exit. Indeed, mere seconds earlier, O'Brien had observed Tubby do just that after being shot with the first bean bag round.

Finally, the Estate argues that O'Brien's conduct was unreasonable because, by the time he fired his weapon, he had seen each of Tubby's hands empty and thus should have deduced that he was unarmed. The district court properly rejected this argument. Even if O'Brien had seen each of Tubby's hands empty, he never saw them *simultaneously* empty and thus could not be sure that Tubby had not simply moved his weapon from one hand to the other underneath his shirt. Moreover, although the Estate insists that O'Brien should have known that both of Tubby's hands were empty, the record reveals that only about ten seconds elapsed between Tubby's exit from the squad car and O'Brien's discharge of his firearm. And this was a hectic ten seconds: multiple bean bag rounds were fired, officers were frantically shuffling around the sally port's exit with guns drawn, a canine unit was released to pursue Tubby, and Tubby fell multiple times. To expect the responding officers to have kept a running mental inventory of exactly what was in which of Tubby's hands at each moment is unreasonable given the pandemonium playing out in the sally port.

> 2. *Assuming Arguendo that a Constitutional Right of Tubby Was Violated, Was Such a Right "Clearly Established?"*

Even assuming O'Brien had violated a constitutional right belonging to Tubby, the Estate has not put forth any cases convincing us that the right was "clearly established." We therefore further hold that O'Brien is entitled to qualified immunity shielding him from suit.

The doctrine of qualified immunity shields public officials from being sued in their official capacities unless their actions "violated a statutory or constitutional right that was clearly

established." *Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014) (internal quotation marks omitted). The Supreme Court has held that a right is "clearly established" for qualified immunity purposes if its "contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id.* In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011). And in order to answer the question "beyond debate," the Supreme Court has repeatedly emphasized that the clearly established law must share specific details with the facts of the case at hand. *White v. Pauly*, 137 S. Ct. 548, 552 (2017) ("[T]he clearly established law must be 'particularized' to the facts of the case." (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Though to defeat a defendant's assertion of qualified immunity plaintiffs need not produce a case directly on point, defining the applicable law "at a high level of generality" simply will not do. *Al-Kidd*, 563 U.S. at 741–742. Only in the "rare 'obvious case' [will] the unlawfulness of the officer's conduct [be] sufficiently clear [without] existing precedent … address[ing] similar circumstances." *D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018). "[This] sounds like a high bar because it is—qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Lopez v. Sheriff of Cook Cnty.*, 993 F.3d 981, 988 (7th Cir. 2021) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The Estate offers only two cases purporting to establish that O'Brien violated a "clearly established" right belonging to Tubby. Neither is at all close to being "particularized to the facts of [this] case," *Pauly*, 137 S. Ct. at 552, and, therefore, neither satisfies the "high bar," *Lopez*, 993 F.3d at 988, required to defeat the defendant's assertion of qualified immunity.

First, the Estate points to *Garner* for its proposition that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead." 471 U.S. at 11. But the Supreme Court itself has held that *Garner* is "cast at a high level of generality" and therefore cannot clearly establish rights for the purposes of qualified immunity, except in the most obvious cases. *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004). As illustrated by our discussion in the previous section, "[t]he present case is far from the obvious one where … *Garner* alone offer[s] a basis for decision." *Id.*

Then the Estate cites this Circuit's decision in *Becker v. Elfreich*, 821 F.3d 920 (7th Cir. 2016), where we held that a reasonable jury could conclude that a police officer used excessive force in executing a search warrant when he deployed a police canine to apprehend an arrestee using the "bite and hold" technique. *Id.* at 927–28. While the discussion in *Becker* includes more details than the rule from *Garner*, those details share very few similarities with the instant case, and *Becker* therefore cannot have clearly established the right asserted by the Estate. Importantly, the arrestee in *Becker* never displayed any conduct suggesting to the officers that he was armed. In fact, he "did not exhibit any sort of aggressive behavior toward [the arresting officer] or anyone else." *Id.* at 927. "Nor was [the arrestee] actively resisting arrest or attempting to evade arrest by flight." *Id.* These dissimilarities with the instant case are more than sufficient for us to conclude that *Becker* provides no help to the Estate's attempt to defeat O'Brien's assertion of qualified immunity.

\*        \*        \*

We hold that, given Tubby's conduct, no reasonable jury could conclude that O'Brien's use of force violated Tubby's

Fourth Amendment rights. Furthermore, we hold that O'Brien is entitled to qualified immunity because the right he is alleged to have violated was not "clearly established" at the time. For these reasons, we affirm the district court's entry of summary judgment on the Estate's § 1983 claim against O'Brien.

## B. The Failure-to-Train and *Monell* Claims Against the City of Green Bay and Chief Smith

The Estate also brings claims against the City of Green Bay and GBPD Chief Smith. In particular, the Estate alleges that both failed to properly train their officers in how to remove a non-compliant arrestee from a squad car, and it alleges that the City has a widespread practice of using excessive force— a claim it brings under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).

The district court properly dismissed each of these claims on summary judgment because it had dismissed the underlying claim against O'Brien. With respect to the *Monell* claim, "a municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee." *Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 504 (7th Cir. 2010). With respect to the failure-to-train claim, "[a] failure to train theory or a failure to institute a municipal policy theory requires a finding that the individual officers are liable on the underlying substantive claim." *Tesch v. Cty. of Green Lake*, 157 F.3d 465, 477 (7th Cir. 1998). Because we affirm the dismissal of the § 1983 claim against O'Brien, we also affirm the dismissal of the failure-to-train and *Monell* claims against the City of Green Bay and Chief Smith.

### C. The Failure-to-Intervene Claims Against Deputies Mleziva and Winisterfer

The Estate also alleges that two of the other officers present in the sally port are liable for failing to intervene and prevent Tubby's death. We affirm the district court's entry of summary judgment on these claims.

"An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) (emphasis omitted). In sum, an officer must know that a citizen's rights are being infringed, and he must have a "realistic opportunity" to intervene. "Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Abdullahi*, 423 F.3d at 774 (emphasis omitted) (quoting *Lanigan v. Vill. of East Hazel Crest, Ill.*, 110 F.3d 467, 478 (7th Cir. 1997)).

In this case, neither Deputy Mleziva nor Deputy Winisterfer had a realistic opportunity to intervene. The videos from the record reflect that many of the responding officers (understandably, we think) had their guns drawn and pointed at Tubby as he rushed towards the sally port exit. Because gunshots happen instantaneously, there was no period of time before O'Brien actually fired in which Mleziva and Winisterfer

could have known that he was going to shoot, at least not with any higher likelihood than any of the other officers who had their guns drawn. The deputies were also likely focused on the supposedly armed, and possibly suicidal or homicidal, suspect who seemed to be attempting to escape or attempting to attack the officers towards whom he was rushing. It is therefore wholly unrealistic to expect the deputies to have trained their attention on O'Brien rather than said suspect or any of the other officers who had their guns drawn. Because no reasonable jury could conclude that either Deputy Mleziva or Deputy Winisterfer had a realistic opportunity to intervene, summary judgment on these failure-to-intervene claims was warranted.

### D. The Failure-to-Train Claims Against Brown County and Brown County Sheriff's Office

The Estate also brought failure-to-train claims against Brown County and certain officers of the Brown County Sheriff's Office, alleging that these entities failed to properly train Deputies Mleziva and Winisterfer about how to intervene when an officer is using excessive force. These claims fail for the same reason as the failure-to-train claims against the City of Green Bay and the Green Bay Chief of Police: the underlying substantive claims—this time against Mleziva and Winisterfer—lack merit. *See Tesch*, 157 F.3d at 477 ("A failure to train theory or a failure to institute a municipal policy theory requires a finding that the individual officers are liable on the underlying substantive claim.").

### E. The State-Created Danger Claim

Lastly, the Estate brought a § 1983 claim against Zeigle, the City of Green Bay, and Brown County, alleging that these

entities violated Tubby's constitutional right to due process. In particular, the Estate brings this claim under the state-created danger exception to the rule pronounced by the Supreme Court in *Deshaney*. But the Estate misunderstands the holding from *Deshaney*, and we hold that the facts of this case do not fit into the state-created danger exception.

In *DeShaney v. Winnebago County Department of Social Services*, a young boy had been in and out of hospitals with injuries suggesting that his father was physically abusive. 489 U.S. 189, 192–93 (1989). Although government officials took minor steps towards monitoring his safety, they allowed the boy's father to retain custody. *Id.* After the father eventually beat the boy so severely that he was left with a permanent mental disability, the boy and his mother sued the government officials for failing to remove him from his father's care. *Id.* at 193. The Supreme Court affirmed the decision of this Court, which had, in turn, affirmed the district court's dismissal of the case on summary judgment. *Id.* at 193–94. The Supreme Court held "that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197.

In *DeShaney*, the Court suggested that a different result may have issued under either of two different circumstances: (1) instances where the state has a "special relationship" with (i.e., involuntary custody of) the victim such that the victim is unable to protect himself, and (2) instances where the state takes affirmative steps that subject the victim to harm or make the victim more vulnerable to harm (the "state-created danger" exception). *Id.* at 199–201. Lower courts have since transformed these into full-blown exceptions to *Deshaney*'s holding that a state does not violate the Due Process Clause by failing

to protect an individual against private violence, though this Court has described the exceptions as "limited" and "narrow." *First Midwest Bank Guardian of Est. of LaPorta v. City of Chi.*, 988 F.3d 978, 988 (7th Cir. 2021), *cert. denied sub nom. First Midwest Bank v. City of Chi.*, 142 S. Ct. 389 (2021).

It is the state-created danger exception under which the Estate brings its claims against Zeigle and the two municipalities. The Estate alleges that Zeigle and the municipalities (via their police officers) created the danger that eventually led to Tubby's death by deploying an ill-conceived plan to use pepper spray to induce Tubby to exit the squad car. This plan, the Estate claims, inevitably led to the hectic scene that played out and ultimately caused O'Brien to shoot Tubby.

But in attempting to take advantage of this "narrow" exception to *Deshaney*, the Estate misapplies *Deshaney*'s holding to an entirely different scenario and then argues that the same exceptions should apply. *Deshaney* held that the state does not violate the constitution by failing to protect an individual against "*private* violence." *Id.* at 197 (emphasis added). This Court has affirmed that this rule applies only to situations in which the harm is perpetrated by private actors. *See, e.g.*, *Wilson v. Warren Cty., Ill.*, 830 F.3d 464, 469 (7th Cir. 2016) ("Due Process does not require a state to protect citizens from private acts unless the state itself creates the danger."). Limiting *Deshaney*'s rule to instances of private harm makes sense, too, as of course the government violates constitutional rights when it directly perpetrates unjustified violence against an individual. But in such cases, 42 U.S.C. § 1983 allows the victim to seek redress directly for the harm rather than under a significantly more attenuated "state-created danger" theory.

None of the cases cited by the Estate demand a different result. For instance, the Estate argues that this Court's holding in *White v. Rochford*, 592 F.2d 381 (7th Cir. 1979), suggests that the state-created danger doctrine does apply to public harms. *White*, however, provides the Estate no help. In that case, which was decided a decade before *Deshaney*, police officers arrested a man after pulling him over on a Chicago highway but left the minor children he was transporting on the side of the road with no way to get home. The Court held that the officers' failure to protect the children from the harsh winter weather constituted a violation of their due process rights and allowed the case to proceed under 42 U.S.C. § 1983.

But the Estate's attempt to stretch this holding is unpersuasive. First, weather, unlike a police officer, is not a public actor, and the case therefore does not stand for the proposition the Estate wants it to—namely, that the state-created danger exception to *Deshaney* allows plaintiffs to recover for harms perpetrated directly by public officials. Nor does the case even mention the phrase "state-created danger," which makes sense because it was decided ten years before *Deshaney*. *White*, then, cannot stand for the proposition that the state-created danger exception to *Deshaney* should be extended to harm affirmatively perpetrated by public actors. In such instances, the proper vehicle for redress is a § 1983 claim against the entities who perpetrated the harm, seeking redress directly for that harm. None of the other cases cited by the Estate come from this Circuit, and, moreover, none involves facts analogous to those here.

Finally, the Estate claims that we will create a "loophole in liability" if we hold that the state-created danger exception to the *Deshaney* rule applies only to private harms. The Estate's

only reason for this assertion is that such a rule would supposedly preclude it from recovering anything if a jury determined that a reasonable officer could have believed that Tubby was armed. In such a situation, O'Brien would not be liable, and, the Estate claims, there would be no recourse for the officers who forced out into the open a man they believed to be armed, thereby creating a fraught situation likely to cause harm.

The Estate's conclusion on this point is simply not true. In such a situation, state common law may provide recourse via tort claims (like those the Estate brought in this very case), and even if state law did not allow for such claims, it would not follow that this Court can or must step in and use the Constitution of the United States to fill that gap.

*       *       *

In sum, the Estate ignores the nuances of *Deshaney* and its outgrowth of exceptions. The Estate attempts to frame the "state-created danger" exception as a claim unto itself and extracts the applicable elements from their context, copying them into its brief as if they make out a free-standing claim. But *Deshaney* was limited to private acts of harm. Exceptions to *Deshaney*'s holding thus also apply only to instances involving private acts of harm. This case involves harm carried out by public law enforcement officers, and therefore *Deshaney* and the exceptions thereto are wholly inapposite. We therefore affirm the lower court's entry of summary judgment on the Estate's state-created danger claim.

### III.    Conclusion

Tragic as the consequences were, O'Brien's conduct did not violate Tubby's constitutional rights to be free from unreasonable seizures, and, additionally, qualified immunity shields O'Brien from liability. For both of these reasons, the district court's entry of summary judgment on the Estate's § 1983 claim was proper. Without that claim, the other dependent federal claims must also be dismissed. The last remaining federal claim, the state-created danger claim, has no relevance to the facts of this case and should therefore be dismissed. Without any federal claims over which it had original jurisdiction, the district court's decision not to exercise supplemental jurisdiction over the pendent state law claims was not an abuse of discretion. For all of these reasons, we AFFIRM the district court's entry of summary judgment.